UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VICTOR ALEJANDRO FERNANDEZ (2),<br><br>Defendant. | CASE NO. 14cr0277-GPC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**<br><br>[ECF No. 153.] |

On April 1, 2016, Defendant Victor Alejandro Fernandez ("Defendant" or "Fernandez") filed a motion to suppress statements. (ECF No. 153.) The government filed an opposition. (ECF No. 154.) An evidentiary hearing was held on April 22, 2016. (ECF No. 155.) Assistant U.S. Attorney Sabrina Feve appeared on behalf of the government. (Id.) Jose Garza Badillo, Esq. appeared on behalf of Defendant. (Id.) Following the hearing, the Court took the matter under submission. Based upon the pleadings, evidence submitted and arguments of counsel, the motion to suppress statements is DENIED.

**DISCUSSION**

**A.  PROCEDURAL BACKGROUND**

On February 6, 2014, a federal grand jury returned an Indictment charging Fernandez and Jason Ray Bailey ("Bailey") with Conspiracy to Commit Wire Fraud (Count 1), in violation of 18 U.S.C. § 1349, and Computer Hacking (Count 2), in

violation of 18 U.S.C. § 1030(a)(4). (ECF No. 3.)

On July 2, 2014, a Superseding Indictment was returned charging Fernandez, Bailey, and John Gordon Baden with Conspiracy to Commit Wire Fraud (Count 1) and Computer Hacking (Count 2). (ECF No. 35.) The Superseding Indictment also charged Fernandez with three counts of Aggravated Identity Theft (Counts 3-5), in violation of 18 U.S.C. § 1028A(a)(1). (*Id.*) On May 6, 2015, the government obtained a Second Superseding Indictment that charged Fernandez and Joel Nava with Conspiracy to Commit Wire Fraud (Count 1) and Computer Hacking (Count 2). (ECF No. 83.) The Second Superseding Indictment also charged Fernandez with three counts of Aggravated Identity Theft (Counts 3-5). (Id.)

The conspiracy count alleges that beginning in or about February 2011, Fernandez, Jason Ray Bailey, John Gordon Baden, and Joel Nava conspired to obtain and share log-in credentials for the computer servers of a U.S. mortgage company ("Company A"), to use these and other misappropriated log-in credentials to steal customer records containing sensitive personal identification information ("PII") (e.g., social security numbers, bank account numbers, dates of birth), and to use this stolen PII without authorization to open credit cards and lines of credit, as well as to take over victims' bank and brokerage accounts. (*Id.*)

**B.   STATEMENT OF FACTS**

On the evening of February 11, 2014, Fernandez was arrested at the San Ysidro Port of Entry ("POE"). At the POE, FBI Special Agents Christopherson and Cabral advised Fernandez of his Miranda rights at approximately 9:45 p.m. and presented him with a written description of those rights. (ECF No. 154-1, C.M. Christopherson Decl. at ¶ 4.) Fernandez expressed a desire to speak with counsel and the interview was terminated. (*Id*.) Because Fernandez was apprehended after normal business hours, the agents were unable to get a booking window at the Metropolitan Correction Center ("MCC"). (*Id*. at ¶ 5.) As a result, Fernandez spent the rest of the night at the POE and the agents prepared to book Fernandez into the MCC the next morning, February 12,

2014.  (*Id*. at ¶ 5.)

On the morning of February 12, 2014, the agents drove Fernandez to the MCC and did not discuss Fernandez's case during the drive. (*Id*. at ¶ 6.) The MCC refused to accept Fernandez because he appeared to be positive for tuberculosis. (*Id*.) The agents then took Fernandez to Alvarado Medical Hospital ("Alvarado"). Fernandez wore a surgical mask after he left the MCC and did not talk with the agents during this drive. (*Id*.) Upon arrival at Alvarado, the agents arranged for Fernandez to be admitted, but could not leave Fernandez because the hospital required that Fernandez be guarded at all times. (*Id*. at ¶ 6.)

February 12, 2014 Statement

On February 12, 2014, at Alvarado, medical personnel placed Fernandez in a specialized room designed for patients with airborne diseases. (*Id*. at ¶ 7.) The agents were standing outside the room when they saw Fernandez motion for them to enter his room. (*Id*.) Upon entering the room, Fernandez appeared visibly shaken. He said, without prompting, that he feared for the safety of his partner. (*Id*.) The agents asked why he feared for her safety and Fernandez replied that it was because of the charges he was facing. (*Id*.) Without any questioning, Fernandez then admitted to the computer hacking and wire fraud charges for which he was arrested. (*Id*.)

The agents reminded Fernandez that he had invoked his right to counsel and that they could not discuss the details of his fears because of that invocation. (*Id*. at ¶ 8.) The agents said they would help protect Fernandez's partner, but repeatedly reminded him that it was improper to have a substantive discussion about his fear. (*Id*.) The agents said that it might help them in the future to protect Fernandez's partner if they knew why she was in danger, but reiterated that they would try to help her without knowing why she was in danger. (*Id*. at ¶ 8.)

The agents then asked Fernandez how they could help protect his partner. (*Id*. at ¶ 9.) He asked the agents to call his mother and request that she go to Tijuana and move his partner to a safe location. Agent Cabral, who is a native Spanish speaker,

then called Fernandez's mother and conveyed the requested message. (*Id.*)

After Agent Cabral called Fernandez's mother, Fernandez agreed to talk to the agents without an attorney present. (*Id.* at ¶ 10.) The agents did not have a copy of the pre-printed Miranda advisal with them at the hospital because they had not intended to speak with Fernandez. (*Id.*) The agents did, however, verbally advise Fernandez of his Miranda rights. (*Id.*) They also knew that, the night before, Fernandez had read the written form that described these rights before he invoked. (*Id.*) At approximately 4:52 p.m., Fernandez verbally waived his Miranda rights. (*Id.*)

Fernandez told the agents that he wanted a deal similar to the one given to "Walter." (*Id.* at ¶ 11.) He then told the agents that he had conducted the computer hacking and wire fraud for unspecified individuals. (*Id.*) He said it was mostly for these individuals' financial benefit. (*Id.*) Fernandez said that it did not make sense for him to conduct this activity, which was lucrative, and to stay in Tijuana. (*Id.*) The agents asked Fernandez how he got involved in the activity. (Id. at ¶ 12.) Fernandez responded that he was initially tasked with finding people in the U.S. who could go to a store, open a line of credit using a victim's stolen PII, and then make fraudulent purchases using this credit. (*Id.*) Later, Fernandez was tasked with finding people in the U.S. who could open or use bank accounts to receive wire transfers and withdraw cash. (*Id.*) After making these statements, Fernandez invoked his right to have a lawyer present at approximately 5:20 p.m. (*Id.*) At that time, the agents terminated the interview. The FBI thereafter arranged for different agents to take shifts guarding Fernandez. (*Id.*)

February 15, 2014 Statement

On February 15, 2014, FBI Special Agent Zeman was on guard at Alvarado. Fernandez had visible tattoos including the letters "VCV" that, to agents familiar with gang cases, indicated he was a member of a gang. (*Id.* at ¶ 13.) Agent Zeman asked Fernandez which "[gang] set" he was from and Fernandez said, "VCV," which is a common abbreviation for the Varrio Chula Vista gang. (*Id.*) Agent Zeman asked what

Fernandez was "called" and Fernandez replied, "Vandal." (*Id.*) Fernandez also listed some of the California and Mexican prisons he was in after being asked. (*Id*.)

### February 22, 2014 Statement

On February 22, 2014, FBI Special Agents Kelley and Bortzfield were guarding Fernandez. (*Id.* at ¶ 14.) At approximately 2:40 p.m., Fernandez requested that they escort him to the restroom. (*Id*. at ¶ 14(a).) While using the restroom, Fernandez said, "fuckin' Jason Bailey," "Jason Bailey . . . I heard he was in Fresno," and, in apparent reference to Bailey, "that's like the pot calling the kettle black." (*Id.*) Fernandez then asked the agents about his case and was told they could not discuss it with him at this time. (*Id*.) Fernandez then said that he was glad that he was caught for "hacking" and "wire fraud" instead of "other stuff." (*Id*.) Fernandez also told the agents that, "you saw my tattoos," which included tattoos indicating membership in a Chula Vista gang that is loyal to the Mexican Mafia. (*Id*. at ¶ 14(b).) Fernandez said that California prison investigators had tried to validate him as a Mexican Mafia associate, but that he left prison before they could do so. (*Id.*) Fernandez said that he was glad that he had been in Mexico for the last seven years, because if he had remained in the United States, he would like have been caught up in Mexican Mafia-related activity. Fernandez appeared to take pride in having a "low number . . . a K number" with the California Department of Corrections and Rehabilitation. (*Id*.)

Fernandez asked the agents about Jose Alberto "Bat" Marquez, a validated Mexican Mafia member with ties to San Diego, and was told that Marquez was in custody. (*Id*. at ¶ 14(c).) Fernandez asked if there were any "carnales" in the MCC, which appeared to be a reference to the Spanish term used to refer to a made member of the Mexican Mafia. (*Id.*) Fernandez said that he knew individuals who were involved with the Mexican Mafia while he was in Mexico. (*Id.*)

During the exchange that took place as the agents were escorting Fernandez to and from the restroom, the television in Fernandez's hospital room was on. (*Id.* ¶ 14(d).) A Spanish-language program was broadcasting information regarding the arrest

of Joaquin "Chapo" Guzman. (*Id.*) Fernandez said that he was once held in the same prison as Guzman for 80 days os suspicion of crimes involving 900 kilograms of marijuana and over 20 firearms. (*Id.*) Fernandez said that he was tortured for five days while he was in custody and that he was later released without being charged. (*Id.*) Fernandez said that he witnessed the murder of his best friend in Mexico on December 3, 2013, and told the agents, "you can Google it if you don't believe me." (*Id.*) After this statement, the agents told Fernandez that, while they were interested in the information regarding the murder, they could not discuss it with him until he had made arrangements with his defense attorney. (*Id.*)

On February 26, 2014, Fernandez was cleared of tuberculosis and brought before a magistrate. He was arraigned at that time. (ECF No. 9.)

## C.   LEGAL DISCUSSION

Defendant made three different post-arrest statements: the statements made to Agents Christopherson and Cabral on February 12, 2014 (the "February 12th Statements"); the statements made to Agent Zeman on February 15, 2014 (the "February 15th Statements"); and the statements made to Agents Kelley and Bortzfield on February 22, 2014 (the "February 22nd Statements"). Fernandez moves to suppress these statements arguing that all three statements were involuntary and were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), given that they followed his February 11th assertion of his Fifth Amendment right to counsel. (ECF No. 153, Def. Mot. at 1.) The government responds that it does not intend to offer the February 15 and 22, 2014 statements in its case-in-chief and that the motion to suppress these statements for alleged violations of *Miranda/Edwards*[1] is therefore moot. But, the government reserve the February 12th statements for its case-in-chief, and argues that all three statements were voluntarily made.

Given the government's representations, the Court finds that Defendant's motion to suppress the February 15th and 22nd statements for violations of *Miranda/Edwards*

---

[1] *Edwards v. Arizona*, 451 U.S. 477 (1981).

is moot under *New York v. Harris*, 495 U.S. 14 (1990) and *Oregon v. Elstad*, 470 U.S. 298 (1985). *Harris* provides that statements obtained in violation of *Miranda* generally are inadmissible in the government's case-in chief. 495 U.S. at 20. Meanwhile, *Elstad* permits the admission of voluntary statements, even if obtained in violation of Miranda, as impeachment evidence. 470 U.S. at 307; *see also United States v. Gomez*, 725 F.3d 1121 (9th Cir. 2013). As to these statements, what remains is to determine whether the statements were made voluntarily.

### 1. INVOCATION OF RIGHT TO COUNSEL

In *Miranda*, the Supreme Court held that the Fifth and Fourteenth Amendments' proscription against compelled self-incrimination required that any interrogation of a suspect in custody must be preceded by advice that he has the right to the presence of an attorney. *Miranda*, 384 U.S. at 479. Law enforcement must immediately cease interrogating a suspect if, "in any manner, at any time prior to or during questioning," the suspect invokes the right to remain silent or the right to an attorney. *Miranda*, 384 U.S. at 473-74. Subsequently, the Supreme Court explained that *Miranda* established that:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U.S. 484, 485 (1981).

In this case, there is no dispute that, on February 11, 2014, Defendant was given his *Miranda* rights in written form and he invoked his right to counsel. The issue is whether Agents Christopherson and Cabral's words or actions on February 12, 2014 constituted an "interrogation" for the purpose of *Miranda*. "Interrogation" is defined not only as express questioning but its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of interrogation includes

"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id*. at 301.

An objective test determines whether questioning constitutes interrogation. "Although the officer's subjective intent is relevant, it is not decisive . . . because in determining whether interrogation occurred, the focus is upon the defendant's perceptions. . . ." *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (internal citations omitted).

In this case, the evidence shows that the agents provided Fernandez his *Miranda* rights and ceased any interrogation following his invocation of his right to counsel on February 11, 2014. After Fernandez was turned away from the MCC on February 12, 2014 due to signs of tuberculosis, the agents transported Fernandez to Alvarado for medical treatment and stood guard outside of his room.

Fernandez asserts that the agents were hovering outside his emergency room and created a coercive environment. (ECF No. 153, Def's Mot. at 7.) This argument is misplaced given the fact that the agents were tasked with guarding Fernandez, and their task was to diligently watch over a detainee in an non-secure facility. There is no indication that the agents were hovering as a means of reinitiating a conversation with Fernandez.

The record reveals that prior to the February 12th contact, Fernandez motioned for the agents to enter his hospital room and, appearing shaken, revealed that he feared for the safety of his girlfriend. The agents asked why he feared for his girlfriend's safety. This question did not focus on the pending charges but, instead, responded to a fear that was reported by Fernandez. Given Fernandez's fear for his girlfriend, it was natural that the agents would ask why he was afraid in order to address the fear. The Court concludes that the question was not reasonably likely to elicit an incriminating response. When Fernandez made a statement admitting to the charges for which he was arrested, it was not in response to a question related to the charges. After the

incriminating statement was volunteered, the agents reminded Fernandez that he had invoked his right to counsel. Up to this point, there is no evidence that Agents Christopherson and Cabral said or did anything which was reasonably likely to elicit an incriminating response.

Afterwards, the agents told Fernandez that they would try to help his girlfriend without knowing why she was in danger. The agents then contacted Fernandez's mother as requested. The Government asserts in their opposition that "then Fernandez said he wanted to talk to them about his case and the agents verbally advised him of his *Miranda* rights. No interrogation occurred." (ECF No. 154, Gov't Opp. at 8.) However, Agent Christopherson's declaration is less clear on this question and states that "[a]fter Agent Cabral called Fernandez's mother, Fernandez agreed to talk without an attorney present." (ECF No. 154-1, Christopherson Decl. ¶ 10.) This sequence of events is not clear as to who wanted to talk about the case. *Cf. Edward*, 451 U.S. at 487 ("Edwards stated that he would talk, but what prompted this action does not appear.")

There is no question Fernandez reinitiated a meeting with the agents and, in the process, made an incriminating statement which was volunteered and is admissible. *Cf. Edwards*, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.") This contact was not designed to badger defendant into waiving a previously asserted *Miranda* rights. While Fernandez certainly initiated the initial contact to report his fears relating to his wife and for the agents to do something, the only remaining question is whether Fernandez's initiation of contact regarding fears for the safety of his girlfriend permitted the agents to approach Fernandez to discuss the pending charges. *Edwards* also addresses the present situation by counseling that:

/ / / /

/ / / /

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Edward*, 451 U.S. at 486 n.9. As such, even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-45 (1983).

In this case, the Court finds that the government has met this burden. Fernandez initiated the contact and conversation with the agents regarding steps to protect his girlfriend. In the course of this conversation, he also made incriminating statements to the agents. After reminding Fernandez of his earlier invocation and repeatedly reminding him that it was improper to have a substantive discussion about his fear, the agents stated that "it might help later to protect Fernandez's partner if we knew why she was in danger, but reiterated that we would try to help her without knowing why she was in danger." (ECF No. 154-1, Christopherson Decl. ¶ 8.) Agents Christopherson and Cabral had not brought a written *Miranda* form with them because they intended only to transport Fernandez from the POE to the MCC and, upon learning of his tuberculosis, to Alvarado. They tried to address his safety concerns without discussing his case. Afterwards, they gave him a verbal *Miranda* warning prior to questioning regarding the case.

Fernandez complains that the agents failed to provide written warnings to him and that they could have waited to receive another *Miranda* rights form. (ECF No. 153, Def. Mot. at 10.) Fernandez does not dispute that oral *Miranda* warnings were provided or question the adequacy of the warnings. However, even if he had, settled Ninth Circuit law permits the government to rely on earlier *Miranda* warnings. *See*

*Maguire v. United States*, 396 F.2d 327, 331 (9th Cir. 1968) (confession obtained three days after the defendant received *Miranda* warnings was admissible); *Biddy v. Diamond*, 516 F.2d 118, 122 (5th Cir. 1975) (holding admissible a statement made shortly after the defendant stated that she remembered the *Miranda* warnings she had received twelve days earlier); *Martin v. Wainwright*, 770 F.2d 918, 929-31 (11th Cir. 1985) (holding admissible a statement made seven days after the full set of warnings). Given the fact that only one day had passed from the time that Fernandez was provided written *Miranda* warnings and he was also given oral warnings, the Court finds that Fernandez was properly advised of his *Miranda* rights. Under the totality of the circumstances, including the necessary fact that Fernandez, not the agents, reopened the dialogue with the authorities, the waiver of the right to counsel was knowing and intelligent. Accordingly, Defendant's motion to suppress the February 12, 2014 statements under *Miranda*/*Edwards* is DENIED.

## 2. VOLUNTARINESS OF POST-ARREST STATEMENTS

The government bears the burden of proving by a preponderance of the evidence that a criminal defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004). The Court must assess the voluntariness of an admission under the "'totality of all the circumstances–both the characteristics of the accused and the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). An involuntary confession violates the Due Process Clause of the United States Constitution and is inadmissible. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In determining whether a statement is "voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

Title 18, United States Code, Section 3501(b) sets forth five factors which a court must review to determine whether a statement is voluntarily made. These factors

include: (1) the time elapsing between arrest and arraignment of the defendant, (2) whether the defendant knew the nature of the offense with which he was charged at the time of making the confession, (3) whether the defendant was aware that he was not required to make any statement and that any such statement could be used against him, (4) whether the defendant had been advised of his right to counsel; and (5) whether counsel was present at the time of defendant's confession. 18 U.S.C. § 3501(b); *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008). No one factor is necessarily conclusive on the issue of voluntariness of a confession. 18 U.S.C. § 3501(b).

Fernandez argues that all three sets of statements were involuntary. Fernandez argues that his confinement to a hospital room, "improper promises about helping to protect his wife," and agents' "contact with his mother" were coercive. (ECF No. 153, Def. Mot. at 15:3-8.) The government responds that the claim is unsupported and lacks legal support.

The record shows that at the time of all three statements, Fernandez was aware of the nature of the offense which he was charged with and had been given his *Miranda* rights in written form on February 11th and in oral form on February 12th. While Fernandez had not yet been arraigned, it was due to the need to treat his tuberculosis at a hospital. Fernandez has offered no facts to support the claim that the circumstances of his confinement were physically coercive. *Cf. Shi*, 525 F.3d at 728 (defendant spent four days locked in a ship's storage compartment before making a post-arrest statement and the court found his conditions of confinement were not evidence of coercion).

As discussed above, there were no "improper promises about helping to protect his wife," and the claim that agents' "contact with his mother" was coercive is conclusory and without merit. In cases involving psychological coercion, the pivotal question is whether the defendant's will was "overborne." *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011). "[C]oercive police activity is a necessary predicate to the finding that a confession is" involuntary. *Connelly*, 479 U.S. at 167. Here, the agents'

efforts to assist Fernandez's partner were plainly made in order to protect someone's life and were not "improper" or "coercive."

There is no evidence that shows Fernandez' will was overborne. No statement was the product of promises, threats or coercive behavior. Accordingly, Defendant's motion to suppress his statements based on voluntariness is DENIED.

## CONCLUSION

Based on the above, the Court DENIES Defendant's motion to suppress statements.

IT IS SO ORDERED.

DATED: May 19, 2016

HON. GONZALO P. CURIEL
United States District Judge